IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID KETCHUM, | ) | |
| | ) | CASE NO. 3:14CV2752 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | KENNETH S. McHARGH |
| SECURITY ADMINISTRATION, | ) | |
| | ) | MEMORANDUM OPINION & ORDER |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. No. 13). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff David Ketchum's ("Plaintiff" or "Ketcham") applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance benefits and Supplemental Security Income benefits on May 26, 2010, alleging disability due to angina, generalized anxiety, hypertension, and severe agoraphobia, with an onset date of November 1, 2005. (Tr. 97-100, 115, 363-68). His applications were denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge. (Tr. 381).

On May 21, 2013, an administrative hearing was held before Administrative Law Judge Gabrielle Vitellio ("ALJ"). (Tr. 433-71). Plaintiff, represented by counsel, appeared and testified at the hearing (*Id.*). Claimant's wife, Nicole Ketcham, as well as a vocational expert ("VE"), Mark Pinti, also appeared and testified. (*Id.*). On September 30, 2013, the ALJ issued a decision finding Plaintiff was not disabled. (Tr. 15-27). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. The Appeals Council denied his request for review, making the ALJ's September 30, 2013, determination the final decision of the Commissioner. (Tr. 7-11).

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. EVIDENCE

### A.  Personal Background Information

Plaintiff was born on July 11, 1970, and was thirty-five years old on the alleged onset date.  (Tr. 25, 111).  Plaintiff completed high school with special education services, and a student series coordinator testified at the hearing that Plaintiff was placed in developmentally handicapped classes due to a low IQ score and weaknesses in social adaptive behavior.  (Tr. 144-45, 154). Plaintiff has past work experience as a block and brick mason.  (Tr. 441).  Plaintiff was previously married from 2001 to 2006, and currently lives with his wife, Nicole Ketcham, whom he met at a friend's house, and married in 2009.  (Tr.  447-48).   Plaintiff has four children from previous relationships, and does not drive because his driver's license was suspended for not paying child support.  (Tr. 448-49).

### B. Medical Evidence[2]

### 1. Physical Impairments

On October 10, 2005, Plaintiff underwent an MRI of his right shoulder at Memorial Hospital.  (Tr. 205).   Imaging showed mild to moderate degenerative changes of his acromioclavicular joint, but no rotator cuff tears.  (*Id.*).  The MRI further revealed a minimal increase signal in the supraspinatus tendon, with potential mild tendinitis.  (*Id.*).

Plaintiff presented at the Memorial Hospital emergency room following a car accident on October 21, 2005.  (Tr. 221).  Medical records show the accident occurred ten days prior to his emergency room visit, and that Plaintiff complained of knee pain.  (*Id.*).  Examination showed

---

[2] The following recital is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

painful range of motion in his right knee, worse with flexion, but with no swelling, and joints appeared stable.  (Tr. 222).  X-rays showed some soft tissue swelling in the suprapatellar region, but no fracture, dislocation, or additional abnormality, and Plaintiff was prescribed pain medication and a knee brace.  (Tr. 222-23).  Records further indicated Plaintiff drove himself to the hospital.  (Tr. 222).

Medical records showed Plaintiff sought medical attention on October 4, 2005, complaining of abdominal pain radiating into the testicles.  (Tr. 233).  He reported that he felt a pop and noticed a bulge in his umbilicus after pushing a heavy object at work on September 27, 2005.  (*Id.*). Medical History notes stated Plaintiff reported he was scheduled for an MRI for injury to his right shoulder for another worker's compensation claim.  (*Id.*).  At this time Plaintiff was diagnosed with umbilical hernia and bilateral testicular pain, and records showed normal and unremarkable findings relating to his other systems, including regular heart rate and rhythm. (*Id.*).  On November 2, 2005, Plaintiff underwent an umbilical herniorrhaphy.  (Tr. 228-29). Records indicated the procedure was performed under a worker's compensation claim, with the purpose of repairing the hernia defect in order to prevent pain and obstruction.  (*Id.*).

On October 25, 2010, Plaintiff presented at the Memorial Hospital emergency room complaining of experiencing moderate, intermittent chest pain described as non-radiating for the past couple of months, but became worse while lifting for his masonry job.  (Tr. 209, 212). Plaintiff reported he drank twelve beers each day, had not taken his Xanax that day, and had found out some upsetting news about his daughter which he thought might be a contributing factor.  (*Id.*).  Notes indicated he did not have a history of similar symptoms, and examination (including EKG and cardiac enzyme testing) showed negative and normal findings.  (Tr. 209-10).  Further, psychiatric exam showed Plaintiff as positive for anxiety, but appropriate mood

4

and affect, and no depression, agitation, or other psychiatric issues.  (*Id.*).  An X-ray showed no acute pulmonary abnormality, and Plaintiff was discharged in stable condition a few hours after admission.  (Tr. 217, 221).

On October 27, 2010, Plaintiff underwent a cardiac stress test.  (Tr. 208).  The report showed mostly normal results, although Plaintiff reported chest pain at the peak of exercise.  (*Id.*).  However, the pain was not associated with any EKG changes or arrhythmia.  (*Id.*).

W. Jerry McCloud, M.D.

On January 28, 2011, state agency non-examining physician W. Jerry McCloud, M.D., reviewed Plaintiff's file and completed a residual functional assessment.  (Tr. 253-59).  Dr. McCloud opined that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, with no other pushing or pulling limitations.  (Tr. 254).  Further, he found Plaintiff could stand and/or walk, as well as sit, about 6 hours in an 8 hour work day.  (*Id.*).  After review of Plaintiff's record, state agency physician Anton Freihofner, M.D., affirmed Dr. McCloud's opinion on April 3, 2012.  (Tr. 310).

Kevin F. Smith, M.D.

Plaintiff underwent a consultative orthopaedic examination on June 25, 2013, conducted by Kevin F. Smith, M.D.  (Tr. 344-48).  Examination notes stated Plaintiff complained of pain in his right shoulder with activities and with use above the shoulder for the past ten to eleven years, and bilateral knee swelling and pain.  (Tr. 344).  A medical history of high blood pressure, heartburn, reflux, arthritis, migraine headaches, and a hernia repair in 2006 was noted, along with medication use for depression and anxiety, and Plaintiff reported he drank twelve to twenty-four drinks daily.  (Tr. 344-45).  Notes showed Plaintiff worked as a mason for twenty-two years, but told Dr. Smith he was last employed in 2006/2007.  (Tr. 345).  Plaintiff indicated he dressed

5

himself but needed help from his wife to put on socks and shoes, because he was unable to bend over.  (*Id.*).  Dr. Smith noted Plaintiff made good eye contact and was active in the conversation during the exam.  (*Id.*).

Dr. Smith's examination showed an antalgic gait, normal range of motion of the cervical spine with no associated pain, reduced range of motion of the right shoulder with associated discomfort, and mild tenderness of the right AC joint and right rotator cuff muscle mass, but a negative drop arm test bilaterally.  (Tr. 345-46).  Plaintiff exhibited the ability to abduct shoulders against resistance with discomfort, as well as flex his elbows and wrists, and extend his wrists, elbows, and grip, bilaterally.  (Tr. 346).  Knee examination revealed reduced range of motion bilaterally, with generalized swelling and medial side joint tenderness, but no valgus or varus angulations, instability, or point tenderness, only mild crepidation, and normal tracking of the patella, bilaterally.  (Tr. 347).  Plaintiff was able to perform a heel and toe walk with difficulty and discomfort in his knees, and was able to squat and rise with difficulty and moderate discomfort in his knees.  (*Id.*).  X-ray imaging of his knees and right shoulder showed no evidence of acute fracture or malalignment (knees) or dislocation (shoulder), and no significant degenerative changes.  (*Id.*).

Dr. Smith diagnosed Plaintiff with pain in his right shoulder and both knees.  (Tr. 348). Based on his examination, review of records from Dr. Wilson dated July 8, 2010 through November 3, 2010, and results from an October 27, 2010 cardiac stress test, Dr. Smith opined Plaintiff could likely perform "at a minimum, a sedentary level of work, if not greater."  (*Id.*). Dr. Smith further suggested a gradual return to activities would be beneficial, as Plaintiff had not recently been regularly active.  (*Id.*).  In his Medical Source Statement relating to work-related abilities, Dr. Smith opined Plaintiff had the ability to:  occasionally lift and/or carry up to twenty

pounds, but never more weight; sit for up to six hours in up to two hour increments during an eight hour work day; stand and walk for one hour without interruption during an eight hour work day; frequently handle, manipulate, feel and push/pull with both hands, but frequently reach with his left hand while only occasionally reach with his right hand; occasionally use his feet but never climb ramps, stairs, ladders or scaffolds or engage in any postural movements; and never be exposed to environmental hazards or operate motor vehicles, but could frequently be around loud noises.  (Tr. 353-57).

2.  Mental Impairments

Paul Wilson, D.O.

On July 8, 2010, Plaintiff presented to Paul Wilson, D.O., for his anxiety.  (Tr. 300).  Medical notes stated Plaintiff had not worked in three years, and had developed severe anxiety.  (*Id.*).  Plaintiff told Dr. Wilson he tried a few jobs but got nervous and walked off, and that he gets nervous around people he doesn't know (noted as social anxiety).  (*Id.*).  Dr. Wilson noted Plaintiff previously worked as a mason, and was used to working with family.  (*Id.*).  Plaintiff denied depression, and stated he does outdoor stuff all the time, including hunting and fishing.  (*Id.*).  Clinical evaluation reported generalized anxiety and depression, and Dr. Wilson prescribed one month off work, along with Prozac and Xanax.  (*Id.*).

Plaintiff again saw Dr. Wilson on November 3, 2010 after presenting at Fremont Memorial emergency room the previous Monday for chest pain.  (Tr. 296).  Notes indicated Plaintiff was calm, and that he was currently taking Xanax.  (*Id.*).  Plaintiff reported he gets chest pain on exertion, including getting red and short of breath when lifting things outside, and Dr. Wilson documented a failed stress test, although review of systems returned generally unremarkable/normal results.  (*Id.*).  According to medical records, on clinical evaluation Dr.

Wilson reported generalized anxiety, hypertension, severe agoraphobia, and angina, and refilled Plaintiff's anti-anxiety and anti-depressant medication prescriptions in August 2010, April 2011, and May 2011. (Tr. 296-99).

On March 12, 2012, Dr. Wilson completed an opinion statement for the Bureau of Disability Determination, and reported Plaintiff suffered from agoraphobia, anxiety, and depression. (Tr. 289). Dr. Wilson indicated he had seen Plaintiff only twice, but that he continued to give him prescriptions of Prozac and Xanax through his wife, who reported the medication helped some. (Tr. 290). The report indicated Plaintiff was afraid to go anywhere, including to the doctor's office, and that he walked off any job he got because of his anxiety. (*Id.*). Dr. Wilson stated Plaintiff's agoraphobia interfered with his treatment, and that his wife reported he was able to work with only his brothers and people he had known a long time, but will go hunting and fishing with friends. (*Id.*). Dr. Wilson opined that Plaintiff was physically able, but mentally unable, to perform sustained work activities due to his agoraphobia, and that Plaintiff needed counseling. (Tr. 291). In response to a request for treatment records on March 18, 2013, Dr. Wilson reported that "he really has no records," that he had only seen Plaintiff a couple of times, and that he has a fear of people. (Tr. 312). Further, he documented that Plaintiff's wife stated his fear of people kept him from working. (*Id.*)

James Kelly, M.Ed.

The state agency referred Plaintiff to James Kelly, M.Ed., for a consultative examination on April 5, 2011. (Tr. 260-68). Mr. Kelly's report indicated Plaintiff's chief psychological complaint was "severe agoraphobia," and described himself as not being able to work because he can't leave the house, gets nervous around people he does not know, and wants to "run away when [he's] in that position." (Tr. 261). Plaintiff reported to Mr. Kelly that he witnessed

excessive violence in his family when he was a child, and that he was sexually abused by a neighbor.  (*Id.*).  Although he had not received any previous mental health evaluations or treatment, Mr. Kelly noted Plaintiff was prescribed Prozac and Xanax by Dr. Wilson, his primary care physician, for the past eight or nine months for anxiety.  (Tr. 262).  Plaintiff told Mr. Kelly that he is usually responsible for performing yard work at his home, and that he drinks a twelve pack of beer each day, but that alcohol has never caused any problems for him.  (Tr. 262, 265).  Mr. Kelly documented that Plaintiff's last job was for an erecting company in 2009, which he left after two days sue to anxiety.  (Tr. 262).  Plaintiff further stated he felt he was a failure as a father because he could not attend his children's sporting events.  (Tr. 263).

Notes indicated Plaintiff had a driver's license at the time of the consultation, but that he was driven by his wife, and was generally resistive during the session. (Tr. 262-63).  Mr. Kelly observed Plaintiff seemed anxious and angry during the interview and refused to participate in parts of the assessment.  (Tr. 263).  Plaintiff abruptly left the room stating he "[had] to get out of here," and Mr. Kelly noted at that point Plaintiff seemed more angry than anxious.  (*Id.*).  However, prior to this Plaintiff exhibited appropriate eye contact, and Mr. Kelly observed Plaintiff did not exhibit motor manifestations including shaking, fidgeting, or pacing.  (Tr. 263).  Further, Plaintiff did not report a history of panic attacks or phobias of certain situations such as heights, flying, or going outside alone or other places or situations, but reported he was anxious in most unfamiliar social situations and avoided social situations.  (Tr. 263-64).  Mr. Kelly diagnosed Plaintiff with generalized social phobia and assigned a GAF score of 50.  (Tr. 266-67).

In his functional assessment, Mr. Kelly opined Plaintiff would be expected to be able to understand and apply instructions in the work setting consistent with average intellectual functioning.  (Tr. 267).  It appeared to Mr. Kelly that Plaintiff's anxiety during the interview

reduced his ability to respond to questions, and "his sensitivity to scrutiny and to answering questions will reduce his ability to respond appropriately in a work setting." (*Id*). Mr. Kelly further opined that, due to a reported history of mental or emotional deterioration in response to work exposure, mainly Plaintiff's report of an inability to adjust to workplace demands and that he deals with stressors by withdrawing and avoiding social contact, he is not expected to respond appropriately to workplace pressures. (Tr. 268).

Steven Meyer, Ph. D.

On April 11, 2011, state agency consultant Steven J. Meyer, Ph. D., reviewed Plaintiff's file relating to his mental impairments. (Tr. 271-87). Dr. Meyer diagnosed Plaintiff with generalized social phobia and personality disorder/mental retardation. (Tr. 280, 282). Dr. Meyer opined Plaintiff had mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, as well as in maintaining concentration, persistence, or pace. (Tr. 285). In his mental residual functional capacity assessment, Dr. Meyer opined Plaintiff would also have moderate limitations in the following abilities: to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers; to respond appropriately to changes in work setting; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independent of others. (Tr. 271-72). Dr. Meyer gave great weight to the opinion of Mr. Kelly, "except for stress which is no greater than modestly limited for psych," based on Plaintiff's lack of treatment history, overall normal mental status evaluations, and no problems relating during examinations. (Tr. 274). He further expressed Plaintiff's statements regarding his conditions and functional limitations were only partially credible. (*Id.*).

Karla Voyten, Ph.D.

10

Karla Voyten, Ph.D. affirmed Dr. Meyer's opinion on March 30, 2012.  (Tr. 309).  After reviewing the record, Dr. Voyten further stated the opinion of Dr. Wilson that Plaintiff was physically able but mentally unable to work was given no weight, because it was not supported by objective evidence.  (*Id.*).  Dr. Voyten further explained that Plaintiff's claims of severe agoraphobia were not supported by the record showing he only took Prozac and Xanax, that he did not receive treatment from a mental health professional, and that Plaintiff went hunting and fishing with friends.  (*Id.*).  Dr. Voyten also pointed out that Dr. Wilson saw Plaintiff on only two occasions.  (*Id.*).

Firelands Counseling – Fredricka Kollingsmith, LSW, and Arthur H. O'Leary, M.D.

On May 20, 2013, Plaintiff underwent a psychological assessment at Firelands Counseling, conducted by Fredricka Kollsmith, LSW.  (Tr. 314-18).  Treatment notes stated Plaintiff presented with alife history of Panic Disorder with current symptoms of severe agoraphobia, stating Plaintiff reported he had been isolating and not wanting to leave the house for years, and gave Plaintiff a GAF score of 45.  (Tr. 314, 316, 318).  Ms. Kollingsmith further noted a diagnosis of Post Traumatic Stress Disorder due to a history of childhood physical and sexual abuse and trauma suffered after finding a deceased friend who had committed suicide.  (Tr. 316, 318).  In her evaluation report, Ms. Kollsmith noted client stated he had a great relationship with his wife, and that he was able to work with his family around him in the past because they made him feel safe, but that he was currently unemployed.  (Tr. 316-17).  He reported a family history of anxiety, and that he did not have a history of inpatient mental health treatment, but that his family doctor prescribed him Xanax and Prozac, which he stopped taking.  (Tr. 317).  Plaintiff informed Ms. Kollsmith he self-medicated with alcohol and drank a case of beer each day to numb him from the anxiety.  (*Id.*).

11

Plaintiff again received counseling with Ms. Kollsmith on June 3, 2013.  (Tr. 319). Treatment notes indicated his agoraphobia was accommodated by allowing him to enter and exit through the end door to avoid the waiting room, but that Plaintiff was too anxious to complete a portion of his therapy entitled My Outcomes.  (*Id.*).  Client reported to Ms. Kollsmith that he had recently gone to the emergency room due to his anxiety but denied he was suicidal, and stated his awareness that his childhood abuse was the root of his problems and he needed to start talking about it.  (*Id.*).

On June 21, 2013, Plaintiff was seen by Arthur H. O'Leary, M.D., at Firelands Counseling for medication management.  (Tr. 341).  Dr. O'Leary's notes stated Plaintiff's relevant mental health history, and indicated his chief complaints of anxiety and depression. (*Id.*).  Plaintiff told Dr. O'Leary he suffers from flashbacks and relives nightmares form past traumatic events, and that he has to sit with his back against the wall hyper-vigilantly scanning the room.  (*Id.*).  Dr. O'Leary reported Plaintiff was obese, had a downcast affect, was tense, and had a somewhat elevated blood pressure.  (*Id.*).  His clinical impression found Plaintiff was clearly suffering from PTSD with anxiety, had difficulty sleeping, panic attacks, and fellings of depression with accompanying symptoms.  (*Id.*).  After discussing treatment alternative, notes indicated Plaintiff was to begin a trial of Remeron for its immediate benefit for sleep.  (*Id.*).

Therapy notes dated July 1, 2013 noted Plaintiff was slightly improving.  (Tr. 336).  On July 8, 2013, Ms. Kollsmith noted Plaintiff stated that he had experience no change since the last session, but she observed Plaintiff as smiling and laughing during the session, and stated he had "a pretty good week," that included camping, fishing with some friends, and helping his son with a concrete job.  (Tr. 335).  Notes indicated Plaintiff felt the walls of the little office were closing in on him during the session, and it was noted that his next session would be held in the family

counseling room.  (*Id.*).  Plaintiff rescheduled his next appointment due to a birthday camping trip, stating he wanted to stretch out his session, but would call if his condition got bad, as he still got very anxious and panic-stricken, and did not venture into stores.  (*Id.*).

Danielle Delong, Psy.D.

Plaintiff was referred to Danielle Delong, Psy.D., by the Division of Disability Determination for a psychological evaluation on Jue 14, 2013.  (Tr. 321).  After interviewing Plaintiff and reviewing medical and counseling records, Dr. Delong diagnosed Panic Disorder with agoraphobia, and Post Traumatic Stress Disorder (per report and review of documentation), and assigned a GAF score of 45.  (Tr. 327).  Plaintiff reported to Dr. Delong he did nto see his family often because he did not leave his home, and he panicked and walked off of job sites when attempting to work since 2005.  (Tr. 323).  However, Plaintiff told Dr. Delong that it was easier to work if he knew the people he was working with.  (*Id.*).  Plaintiff further stated he was hospitalized on June 1, 2013, with anxiety and suicidal thoughts, although he carified the hospital did not admit him.  (*Id.*).  Evaluation notes indicated Plaintiff had symptoms of agoraphobia for longer than ten years, but that they had gotten worse in the previous ten years, and Dr. Delong noted Plaintiff exhibited a limited ability to manage day to day stressors.  (Tr. 324, 326).

Regarding claimant's work-related abilities, Dr. Delong opined Plaintiff's psychological symptoms did not cause limitations in his ability to understand, remember, and carry out instructions, but that he is likely to experience difficulty engaging in instruction follow through in settings in which he was working with unfamiliar people.  (Tr. 329).  Dr. Delong further opined that Plaintiff may exhibit limitations in his ability to maintain attention and concentration, persistence and pace, and to perform tasks due to his reported symptoms of anxiety, and has

limitations in his ability to respond appropriately to supervisors and coworkers.  (*Id.*).  Plaintiff would further have limitations in his ability to respond appropriately to work pressures in a work setting.  (*Id.*).  Dr. Delong completed a mental residual functional capacity assessment and found Plaintiff would have the following limitations:  mild limitations in his ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; moderate limitations in his ability to respond appropriately to usual work situations and changes in a routine work setting; and marked limitations in his ability to interact appropriately with the public, supervisors, and co-workers.  (Tr. 331).

C.  Hearing Testimony

Plaintiff's Testimony

Plaintiff testified his anxiety causes him to get nervous and jittery because he does not like to be around people he doesn't know.  When questioned about how long he has had this problem, Plaintiff said he does not know, possibly all his life, but that it got worse in 2000 or 2005.  (Tr. 445).  Plaintiff testified he tried to work in 2008 for a roofing metal company, but that he had to leave because there were people around he did not know.  (Tr. 443-44).  He further expressed that he could not work because there was "something wrong with [him] in his head."  (Tr. 444).  Plaintiff noted a triggering event for the worsening of his anxiety was in 2001, when he found a friend who had shot himself, but could not point to anything specific that happened in 2005.  (Tr. 446).  Plaintiff explained he now drinks more than twelve beers per day because he "can't deal with things in [his] head," and that he took Prozac and Xanax prescribed by his wife's doctor, Dr. Wilson, for about a year, but no longer took them because they did not work, but instead gave him weird dreams.  (Tr. 450, 455-56).

When asked if he was able to walk a block, Plaintiff stated it was probably true, saying his body was sore and his breathing not great.  (Tr. 450-51).  Noting she did not have records of physical diagnoses of these issues, the ALJ stated she would send Plaintiff for an exam and X-rays with an orthopaedist.  (Tr. 451, 457).  Plaintiff testified the pain in his knees and right shoulder prevented him from walking a lot and lifting heavy boxes.  (Tr. 451-52).

Plaintiff testified he was previously married from 2001 to 2006, and that his driver's license was suspended because of unpaid child support.  (Tr. 448-49).  He stated he does not often take his children anywhere, but will occasionally go with them to the park, driven by his wife.  (Tr. 449-50).  Further, Plaintiff testified he hunted once or twice in 2012 (once alone and once with a friend), but that he did not want to hunt anymore, and no longer wanted to go bowling because he did not want to be around people.  (Tr. 452-53).

Nicole Ketcham's Testimony

Plaintiff's wife, Nicole Ketcham, testitide that at the time of the hearing she had known Plaintiff for seven years, and had been married to him for four years.  (Tr. 25).  Mrs. Ketcham testified she believed her husband is disabled because he hardly ever leaves the house, that there are five or less places he will go, and that he just returns to the car when she tries to make him go with her to the store.  (Tr. 460).  According to Mrs. Ketcham, Plaintiff panics when out at a store if just one person appears in the aisle, causing him to turn red and start to sweat.  (*Id*).  She further stated that she noticed no difference when Plaintiff was taking the medication prescribed by Dr. Wilson, that he was anxious before his first counseling session, and that he does not do any chores or yard work around the house.  (Tr. 461-63).  However, Mrs. Ketcham stated every couple of weeks she and Plaintiff will visit her sister and his cousin at their home for an afternoon, but that he will sit in the car if anyone else comes to the house.  (Tr. 436-64).

## III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.

2. The claimant has not engaged in substantial gainful activity since November 1, 2005, the alleged onset date.

3. The claimant has the following severe combination of impairments:  obesity; agoraphobia; anxiety disorder; personality disorder; and post-traumatic stress syndrome (PTSD).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations:  unskilled work with a specific vocational preparation (SVP) level of two meaning that the claimant can perform simple routine tasks which require no decision-making; no interaction with the public; and occasional interaction with supervisors and co-workers.  Based on allegations of pain and discomfort, I have further limited work to a medium exertional level.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on July 11, 1970 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(Tr. 15-27).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387. However, it may examine all the evidence in the record in making its

decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A.   The ALJ's Assignment of Weight to Medical Opinion Evidence is Supported by Substantial Evidence

The regulations provide that the ALJ is to evaluate every medical opinion in the record, and, unless giving a treating physician's opinion controlling weight, should explain the weight given to the opinion of medical sources while considering the factors set out in the regulations. 20 C.F.R. §§ 416.927(c), (e)(2)(ii) and 404.1527(c), (e)(2)(ii).   These factors include the examining relationship, treatment relationship, length of treatment relationship and frequency of examination, supportability, consistency, and specialization. 20 C.F.R. §§ 416.927(c)(1)-(6) and 404.1527(c)(1)-(6).  An ALJ is not bound by any findings made by any state agency program physicians or psychologists, including psychological consultants. 20 C.F.R. §§ 416.927(e)(2)(i) and 404.1527(e)(2)(i).

The substantial evidence standard presupposes that there is a "zone of choice" within which an ALJ may resolve conflicts in the evidence and decide questions of credibility without interference from the courts.   *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). Nevertheless, if the opinion of a medical source contradicts the RFC finding, an ALJ must explain why he did not include its limitations in the determination of the RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p explains, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with

18

an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  Further, an RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*.

Plaintiff now argues that the ALJ's RFC is not supported by substantial evidence because the ALJ gave insufficient evidentiary weight to the medical opinions of record.  Specifically, Plaintiff objects to the weight given to the opinions of Dr. McCloud, Dr. Smith, and Dr. Delong. Further, Plaintiff asserts the ALJ erred in giving "great weight" to the opinion of Mr. Kelly, while not fully accounting for the limiting symptoms and GAF score expressed in Mr. Kelly's opinion.  As discussed below, despite Plaintiff's assertions to the contrary, the ALJ evaluated the opinion evidence in accordance with the regulations, provided a thorough and well-reasoned explanation for the weight assigned to each opinion, and formulated an RFC supported by substantial evidence.

<u>Dr. McCloud</u>

In her assessment, the ALJ provided good reasons for assigning only "little weight" to the opinion of Dr. McCloud, pointedly referred to as a state agency medical examiner.  (Tr. 25).  *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed. App'x 719, 727-28 (6th Cir. 2013) (*citing* 20 C.F.R. §§ 416.927(e)(2)(i) and 404.1527(e)(2)(i), noting the ALJ was not bound by the opinion of a state agency physician).  The ALJ determined Dr. McCloud's opinion that Plaintiff was limited to light exertional work was not supported by the medical evidence.  After reviewing the record, the ALJ explained his opinion was not supported because no severe medical condition other than obesity had been established.  (Tr. 25).  Further, the ALJ did not ignore, but specifically

acknowledged, that hypertension and angina were mentioned by the medical examiners, but found these conditions were not substantiated due to the EKG showing Plaintiff did not suffer from cardiac abnormalities.  (Tr. 25, 208-09, 254-55, 295-96).

Plaintiff attempts to undermine the ALJ's determination, stating Dr. McCloud took the EKG findings into account when formulating his opinion.  However, Dr. McCloud did not document that he specifically relied on the EKG to show evidence of hypertension or angina, but instead noted Plaintiff's self-reporting of the conditions, and separately stated the EKG was considered in his review.  (Tr.254-55).  Plaintiff fails to establish that the ALJ overstepped her discretionary authority to evaluate the medical evidence and discount the opinion of the state agency examiner where she found the opinion is not supported by that evidence, merely because that evidence was reviewed by the examiner.  *See Rudd*, 531 F. App'x at 728 (the ALJ reserves the right to decide pertinent issues, such as the claimant's RFC, based on her evaluation of the medical and non-medical evidence); *see Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("An ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."). Additionally, Plaintiff does not point to any evidence in the record that was not considered by the ALJ that would undermine the ALJ's reasons for discrediting the opinion of Dr. McCloud.  *See generally Mathews v. Eldridge*, 424 U.S. 319, 336 (1976) (Plaintiff has the burden of establishing his entitlement to disability benefits); *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990); *see generally Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (an ALJ's decision will be affirmed if supported by substantial evidence, even if reasonable minds could disagree or substantial evidence could also support a contrary result).

Dr. Smith

20

There is similarly no merit to Plaintiff's assertion that the ALJ failed to give good reasons for assigning "little weight" to the opinion of Dr. Smith.  In reviewing Dr. Smith's opinion, the ALJ emphasized the open-ended language used by Dr. Smith, specifically that Plaintiff could work "at a minimum" at a sedentary exertional level, "if not greater."  (Tr. 22).  Such language indicated this limitation was not hardfast, but that Dr. Smith felt Plaintiff could potentially work at a higher level of exertion.  *See generally* S.S.R. 96-8p, 1996 WL 374184, at *2 ("RFC does not represent the *least* an individual can do despite his or her limitations or restrictions, but the *most*.") (emphasis in original).  Additionally, the ALJ explained the limitations provided by Dr. Smith were tailored to an individual with extreme physical limitations, and were not consistent with the record (including negative X-rays) which supported only mild difficulties with his knees and shoulder.  (Tr. 22).  Plaintiff's argument that Dr. Smith's limitations were reasonable is merely an invalid attempt by the Plaintiff to re-argue his case based on facts already considered by the ALJ, and he does not point to any evidence that definitely undermines the ALJ's determination.  *See generally Mathews*, 424 U.S. at 336; *see generally Bass*, 499 F.3d at 509.

Further, the ALJ properly considered the length of the treatment relationship, noting a lack of a longitudinal treatment history, as Dr. Smith had only examined Plaintiff on one occasion.  20 C.F.R. §§ 416.927(c)(1)-(6), 404.1527(c)(1)-(6) (when evaluating a medical opinion, an ALJ should consider the length of the treatment relationship and give more weight to opinions of treating sources that have seen the patient enough ties to have obtained a longitudinal picture of his impairment); *see Rudd*, 531 Fed. App'x at 729 ("The regulations recognize that the nature and extent of a treating relationship is relevant to the weight given to physician's opinion.").  Plaintiff provides no authority or case law supporting his argument that an ALJ cannot appropriately consider the treatment history with a state agency doctor where she

requested the consultative examination.  As Plaintiff does little more than make unsupported assertions against the ALJ's reasoning, and attempts to re-argue facts that were clearly considered by the ALJ, the undersigned rejects Plaintiff's assignment of error regarding the weight given to the opinion of Dr. Smith.

Dr. Delong

Despite Plaintiff's argument to the contrary, the ALJ also properly analyzed and provided good reasons for giving only "some weight" to the opinion of Dr. Delong, including her GAF score of 45, which indicated serious symptoms or limitations.  The ALJ noted Dr. Delong's diagnosis of PTSD was based on Plaintiff's self-reporting and review of previous medical records.  (Tr. 24, 321-22, 324-25).  The ALJ then re-stated the findings of Dr. Delong, noting that, despite the lower GAF score, she opined Plaintiff had no limitations in his ability to understand, remember, or carry-out instructions (unless he was working with unfamiliar people), mild limitations in his ability to follow simple instructions, and moderate limitations regarding complex instructions.  (*Id.*).  Dr. Delong found a marked limitation only in Plaintiff's ability to respond appropriately to supervisors and coworkers.  (Tr. 24, 331).

Plaintiff argues Dr. Delong should be afforded more weight because she is an examining mental health professional whose opinion is consistent with other opinions relating to Plaintiff's mental health.  However, this assertion is misguided.  First, just as with Dr. McCloud, as a state agency consultant, the ALJ is not bound by Dr. Delong's opinion.  *See* 20 C.F.R. § 404.1527(e)(2)(i).  Second, in determining her opinion should not be given full weight, the ALJ pointed to inconsistencies in the record.  Specifically, the ALJ pointed out that Plaintiff reported to Dr. Delong that he does not leave his home, despite the record showing "the claimant does engage in some social activity," such as helping his son with concrete work, camping, and

fishing with friends as recently as 2013.  (Tr. 23, 335).  Further, although Plaintiff reported he needed help putting on his pants, socks, and boots due to pain, the ALJ noted there was no medical evidence to support this assertion.  (Tr. 24, 326); *see Turcus v. Comm'r of Soc. Sec.*, 110 Fed. App'x 630, 632 (6th Cir. 2004) ("The ALJ does not need to credit subjective complaints where there is no underlying medical evidence for the complaint.") (*citing Fraley v. Sec'y of Health & Human Servs.*, 733 F.2d 437, 440 (6th Cir. 1984)).  Plaintiff does not point to any evidence to contradict this determination.

Plaintiff's claim that Dr. Delong's opinion is consistent with other opinions of record has no merit.  It is relevant to note that these opinions, namely those of Dr. Wilson, Mr. Kelly, and Ms. Kollsmith (who is not an acceptable medical source), were discredited to some degree by the ALJ.  *See* 20 C.F.R. § 404.1513(a), (d)(3); 65 Fed. Reg. 50746, 50761 (2000) ("[N]ureses, social workers, and physicians' assistants…are not 'acceptable medical sources' who can provide evidence to establish the existence of a medically determinable mental impairment.").   In determining the weight for each source, the ALJ afforded weight as follows:  Dr. Wilson's opinion was given little weight, which was not challenged by Plaintiff; Ms. Kollsmith was given moderate weight, as Plaintiff showed significant signs of improvement less than one month after Ms. Kollsmith rendered her opinion (and also was not challenged by Plaintiff); and Mr. Kelly was given great weight, but not wholly adopted by the ALJ, as discussed in the next section.  Accordingly, this argument provides no support to Plaintiff's assertion that the ALJ committed reversible error in discounting Dr. Delong's opinion.

Mr. Kelly

Plaintiff incorrectly alleges that the ALJ did not properly account for the findings and GAF score of Mr. Kelly, a state agency consultative examiner, despite giving his opinion great

weight.  In her decision, the ALJ gave a detailed account of Mr. Kelly's findings.  Specifically, she noted Mr. Kelly opined Plaintiff would likely have a reduced ability to respond to workplace supervision due specifically to his sensitivity to scrutiny and answering questions, and that he would not respond appropriately to workplace pressures because he responded to stress by withdrawing and avoiding social contact, and because he exhibited a history of an inability to adjust to workplace demands.  (Tr. 23-24, 267-68).  Due to the specific reasons given to support the limitations provided in Mr. Kelly's opinion, it is clear that the ALJ properly considered these limitations and accounted for them when formulating the RFC by limiting Plaintiff to unskilled work involving simple, routine tasks, as well as limiting social contact to no interaction with the public and only occasional interaction with supervisors and co-workers.

Further, Plaintiff argues that the RFC did not properly account for Mr. Kelly's GAF score of 50, which placed Plaintiff in the range of 41-50, indicating serious symptoms or impairments.  However, a GAF score in this range does not automatically render a person disabled.  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007) (GAF scores in the high 40s to mid-50s do not preclude a person from having the mental capacity to hold at least some jobs in the national economy); *see also Turcus*, 110 F. App'x at 632 (GAF score of 35 not disabling).  The ALJ observed that this score was "just one point shy of an assessment of moderate functional difficulty with moderate symptoms."  (Tr. 23).  Considering the GAF score, along with the other limitations presented by Mr. Kelly, the ALJ properly formulated an RFC that reasonably accounted for Plaintiff's limitations.

Plaintiff fails to raise any meritorious argument in support of his assertion that the RFC is not supported by substantial evidence.  After reviewing all the evidence of record, and determining the appropriate weight to afford the opinion evidence, the ALJ formulated an RFC

24

accounting for Plaintiff's substantiated work-related limitations.  Properly building "an accurate and logical bridge between the evidence and the result," the ALJ clearly articulated good reasons in support of her findings, including the weight assigned to the opinion evidence. *Fleischer*, 774 F. Supp. 2d at 877.  Accordingly, this Court finds remand is not appropriate.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date:  February 25, 2016.